# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **CHANCE CLYCE,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **V.** | § | **CIVIL ACTION NO. 3:15-cv-793-G-BN** |
| | § | |
| **FREDERICK FARLEY,** | § | |
| **KENNETH WRIGHT AND** | § | |
| **SHANGIA WILLIAMS** | § | |
| **Defendants.** | § | |

### <u>RESPONSE TO DEFENDANTS WRIGHT AND WILLIAMS</u>
### <u>MOTION FOR SUMMARY JUDGEMENT BASED UPON QUALIFIED IMMUNITY</u>
### <u>AND BRIEF IN SUPPORT THEREOF</u>

Respectfully submitted,

Mr. Martin J. Cirkiel, Esq.
<u>Marty@cirkielaw.com</u> [Email]
State Bar No. 00783829

CIRKIEL LAW GROUP, P.C.
f/k/a Cirkiel & Associates, P.C.
1901 E. Palm Valley Blvd.
Round Rock, Texas 78664
(512) 244-6658 [Telephone]
(512) 244-6014 [Facsimile]
ATTORNEYS FOR PLAINTIFF

## TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

I.      BRIEF RESPONSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.      PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.    EVIDENCE CONSIDERED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IV.    ISSUES FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

V.      STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

A       ABOUT CHASE CLYCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

B.      ABOUT THE HUNT COUNTY JUVENILE DETENTION CENTER. . . . . . . . . . . . . . 3

C.      CHANCE WAS ABUSED AT THE DETENTION CENTER . . . . . . . . . . . . . . . . . . . . 4

D.      STAFF WAS DELIBERATELY INDIFFERENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

VI.    STANDARDS OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

VII.   ARGUMENT AND AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

A       STANDARDS OF REVIEW FOR QUALIFIED IMMUNITY . . . . . . . . . . . . . . . . . . . 21

B.      THE DEFENDANTS WERE DELIBERATELY INDIFFERENT TO CLYCE'S NEED FOR

        MENTAL HEALTH CARE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

C.      THE DEFENDANTS WERE DELIBERATELY INDIFFERENT BY UNNECESSARILY

        ISOLATING CLYCE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

IX.    CONCLUSION AND PRAYER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

XI.    CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## <u>TABLE OF AUTHORITIES</u>

**<u>Federal Cases</u>**

      **Supreme Court Cases**

<u>Wilson v. Seiter</u>, 501 U.S. 294, 298, 302, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991) . . . . . . . 23

      **Courts Of Appeal**

<u>Audler v. CBC Innovis Inc.</u>, 519 F.3d 239 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

<u>Hope v. Harris</u>, 2021 U.S. App. LEXIS 18294 at *18 (5th Cir. June 18, 2021) . . . . . . . . . . 23,24

<u>Jones v. Diamond</u>, 594 F.2d 997, 1020, 1034 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . 24

<u>PlainsCapital Bank v. Keller Independent School District</u>, 746 F. App'x 335, 363 (5th Cir. 2018)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

<u>Rodrigue v. Grayson</u>, 557 Fed. Appx. 341, 346 (5th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . 21

<u>Rombach v. Culpepper</u>, 2021 U.S. App. LEXIS 20713 (5th Cir. 2021) . . . . . . . . . . . . . . . . . . . 20

<u>Thompson v. Upshur County</u>, 245 F.3d 447, 459 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 21

      **Constitution and Federal Statutes**

USCS Const. Amend. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

USCS Const. Amend. 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      **<u>Federal Rules</u>**

Fed. Rule Civ. P. 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Fed. Rule Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**NOW COMES** Chance Clyce, ( herein referred to as Plaintiff or more simply by name) by and through their attorney of record, Martin J. Cirkiel of the Law Firm of Cirkiel & Associates, P.C., and brings this his *Response To Defendants Wright and Williams Motion For Summary Judgment Based Upon Qualified Immunity* (both hereinafter collectively termed the Hunt County Defendants) [DE# 104] an in support thereof, Plaintiff would respectfully show this tribunal the following:

## I. <u>BRIEF RESPONSE</u>

1.    Chance Clyce was born on February 22, 1995. He was 13 years old he was under the care of the Hunt County Juvenile Justice services program. While in its Juvenile Detention Center he was subjected to inhumane living conditions and never received proper medical attention or mental health care by Wright and Williams (and others).  In fact during his entire stay, and multiple complaints by he, his mother and sister over the course of many days, they never sent a nurse to evaluate him for medical or mental health concerns, or both. Because of such failures he required intensive and life-saving hospital care for many months and had to endure multiple surgeries over the course of many years.  Accordingly and due to the acts and omissions of these Defendants Clyce has suffered significant physical and mental injuries and is frankly, damaged forever.  Wright and Williams filed their *Motion For Summary Judgment Based Upon Qualified Immunity* [DE# 99] arguing that neither Defendant was sufficiently involved in the medical treatment of Clyce or were deliberately indifferent towards him or in any case violated any of his "generalized and overly broad alleged constitutional rights .." [DE# 104, p. 5/25].  As Clyce will more show below he has a clearly established constitutional right to receive medical and mental treatment while he was being held in the Hunt County Juvenile Detention Center. Moreover, any reasonable detention officer, including Farley and Williams would surely know they had a duty to

assure Clyce received such constitutionally mandated treatment, whether it be physical, mental, nursing, or a dietician or importantly the facility's *Health Care Services Coordinator* and each failed to do so.

## II.  PROCEDURAL BACKGROUND

2.      Plaintiffs agrees with the Defendants' rendition of the procedural resume in this cause. Clyce has brought forth claims that he was a victim of retaliation as contemplated by the 1st Amendment to the U.S. Constitution; was a victim of unnecessary solitary confinement pursuant to the 4th Amendment; cruel and unusual punishment pursuant to

## III.  EVIDENCE CONSIDERED

3.      Clyce relies upon the entire file in this cause including evidence considered by the District Court in what is best termed *Clyce I*, C.A. No.: 3:09-cv-00351.  They rely upon DE# 65; *Appendix To Plaintiff's Brief In Support Of Its Response To Defendants' Motion For Summary Judgment*] (515 F. App'x 319 (5th Cir. 2013) attached hereto as Exhibit A and paginated accordingly and Exh. C, Affidavit Steve Robinson and Exh. B, Affidavit of James Alan.

## IV.  ISSUES FOR REVIEW

4.      Whether Defendant Farley should be dismissed from this cause because Plaintiff ostensibly failed to comply with Fed. R. Civ. P. 4(m); and

5.      Whether Defendant Farley and/or are entitled to Qualified Immunity.

## V.  STATEMENT OF FACTS

A.      ABOUT CHANCE CLYCE

6.      Chance Clyce was born on February 22, 1995. As a youngster he was diagnosed with a Bipolar Disorder and was prescribed Respirdol for related emotional and behavioral

disturbances.  In 2007, it was alleged he was involved in a number of burglaries and was arrested.  Later, all claims were dropped, but he was convicted of a trespassing charge for opening a car door and was put on probation. Unfortunately, Chance violated the terms of his probation when his urine analysis tested positive for marijuana.  He was admitted to the Juvenile Detention Center in Hunt County in February of 2008 for violating conditions of his probation. 2011 U.S. Dist. LEXIS 158605; at *2; 515 F. App'x 319, 321 (5th Cir. 2013].

7.      The intake form and previous history with the department reflected a significant history of mental and behavioral health issues.   He was treated by a psychiatrist, provided psychological testing, psychoactive medications, ongoing counseling and received special education services at school.  In fact, his mother later brought to the Detention Center what is termed *Admission, Review and Dismissal* ("ARD") Committee paperwork. [Exh. A, p. 43-46, 55-63, 115/156].  His main Counselor was Chatrina Banks-Robinson with the Probation Department who had been providing counseling services to Chance for a significant period of time. [Exh. A, p. 34-42/156].  While at the Detention Center they failed to assure had his Respirdal.   [Exh. A, p. 5/156].

B.      ABOUT THE HUNT COUNTY JUVENILE DETENTION CENTER

8.      The Hunt County Juvenile Detention Center has to follow standards of care commensurate with standards set by the Texas Juvenile Justice Juvenile Justice.  As a matter of law, regulations and the Detention Center's own Policies and Procedures on a daily basis detainees must go to school, shower every evening before bedtime, have access to healthy food, available liquids to remain hydrated, an hour a day of physical exercises class plus another hour of unrestricted time outside the cell.  Additionally, a detainee has to have access to healthy food, counseling services, medical services, a clean environment and

recreation and leisure activities.  The facility has to have a *Health Services Coordinator* [*See* Case 3:90-cv-00351-N, DE# 61-7, p. 4, 10/46; DE# 61-8, p. 7, 13, 16, 21, 51/54] to make sure these and other various health-related services are provided and illness or emergencies responded to within 24 hours, including mental health concerns. [DE# 61-10, p. 29/100; *see* Case 3:90-cv-00351-N, DE# 61, p. 5-6/8; 2011 U.S. Dist. LEXIS 158605; at *2; 515 F. App'x 319, 321 (5th Cir. 2013].

9.      The facility keeps a Room Check Log ("Log") that tracks these and other activities where detainee might leave his cell and provide numbers to be logged in during a juvenile's stay at the facility; i.e., meeting with a counselor (25), lawyer (24), religious program (37), visitation (43), phone calls (38), physical exercise (28), school (41), visits (43) or talking with staff (23) taken together which may be characterized as "out-of-cell activities." There are other items that staff follows which are more related to "on unit" activities like lying or sitting (10), sleeping (12), toileting (17), hygiene (44), showering (42) and consumptio0n or not of food (13, 14) and  liquids (15, 16),  [Exh. A, p. 65].  It is uncontroverted that the day to day decisions made on behalf of Clyce were done so by the Juvenile Detention Officers taking care of him at the time [Case 3:90-cv-00351-N, DE# 61-4, p. 4/40 Affidavit of Brown] including Defendants Farley as Supervisor and Williams.  [Exh. A, p. 27-31].

C.      CHANCE WAS ABUSED AT THE DETENTION CENTER

10.     On February 26, 2008 when Chance entered the facility he was generally good health physically. On that date the daily Log was started.  The 1st Shift always starts at about 7:00am.  The record states he rarely if ever left the room, and spent most of that shift lying down. The Log does not evidence he received any liquids or ate any food. [Exh. A, p. 7, 34, 65/156].  The 2nd Shift started about 3:00pm.  The Log again shows Chance did not leave

his room and spent much of it lying down. There is no evidence he received any liquids or his prescribed medications. [Exh. A, p. 66/156]. The 3rd Shift started about 11:00pm. The Log shows Chance did not leave his room and spent much of it lying down and sleeping. There is nothing evidencing he received any liquids. He took a shower during second shift. Chance did none of the various "out-of-cell" activities on this day, no walking, no physical exercise, no reading, no social interaction. Nothing. [Exh. A, p. 67/156]

11.     The Log for the 1st Shift on the 27th is incomplete but what is there shows Chance did not leave his room and spent much of it lying down. There is no evidence he received any liquids or ate any food. Chance did not participate in any of the out-of-cell activities noted above. [Exh. A, p. 68/156]. The Log for the 2nd Shift on the 27th again shows Chance did not leave his room and spent much of it lying down. There is a notation affirming he received liquids and a snack. There is no notation he received prescribed medication. [Exh. A, p. 69/156]. The Log for the 3rd Shift shows Chance did not leave his room and spent much of it lying down and sleeping. There is no notation affirming he received liquids but he did take a shower during the Second Shift. The medication log states that Chance received Risperdal at 10:36pm. Chance did none of the various "out-of-cell" activities on this day. [Exh. A, p. 70/156]

12.     The Log for the 1st Shift on the 28th shows Chance did not leave his room and spent much of it lying down. There is a notation he did spend some time reading. There is no notation ffirming he received liquids though there is one he ate breakfast. The medication log states that Chance received Risperdal at 10:20am. [Exh. A, p. 71/156]. The Log for the 2nd Shift again show Chance did not leave his room and spent much of it lying down and sleeping. There is no clear notation affirming he received liquids or ate anything. There is a notation

he received prescribed medications.  The medication log states that Chance received another Risperdal at 8:43pm.  [Exh. A, p. 72/156]. The Log for the 3rd Shift shows Chance did not leave his room and spent much of it lying down and sleeping. There is no notation affirming he received liquids or took a shower that day.  Chance did none of the various "out-of-cell" activities on this day. [Exh. A, p. 73/156]

13.    The Log for the 1st Shift on the 29th shows Chance did not leave his room and spent much of it lying down.  There is no notation affirming he received liquids or that he ate breakfast.  The medication log states that Chance received Risperdal at 8:57am and again at 9:45am. [Exh. A, p. 74/156].  The Log for the 2nd Shift again show Chance did not leave his room and spent much of it lying down and sleeping.  There is no clear notation affirming he received liquids but there is that he ate something.  [Exh. A, p. 75/156].  The Log for the 3rd Shift shows Chance did not leave his room and spent much of it lying down and sleeping. There is no notation affirming he received liquids or ate anything.  Chance did none of the various "out-of-cell" activities on this day.  He did get three showers during the second shift. [Exh. A, p. 76/156].

14.    The Log for the 1st Shift on March 1st shows Chance did not leave his room and spent much of it lying down.  There is no notation affirming he received liquids but he did eat.  The medication log states that Chance received Risperdal at 8:36am.  [Exh. A, p. 77/156].  The Log for the 2nd Shift again show Chance did not leave his room and spent much of it lying down and sleeping. There is no clear notation affirming he received liquids but there is that he ate something. There is no notation that he received prescribed medications though the medication log states that Chance received Risperdal at 10:04pm.  [Exh. A, p. 78/156]. The Log for the 3rd Shift shows Chance did not leave his room and spent much of it lying down

and sleeping. There is no notation affirming he received liquids or ate anything though he did shower during second shift. Chance did none of the various "out-of-cell" activities on this day.  [Exh. A, p. 79/156]

15.    The Log for the 1st Shift on March 2nd shows Chance did not leave his room and spent much of it lying down.  There is no notation affirming he received liquids but he did eat breakfast and lunch. The medication log states that Chance received Risperdal at 9:29am. [Exh. A, p. 80/156].  The Log for the 2nd Shift again show Chance did not leave his room and spent much of it lying down and sitting.   There is no notation affirming he received liquids but there is that he ate something.   There is no notation that he received prescribed medications though the medication log states that Chance received Risperdal at 8:53pm. [Exh. A, p. 81/156].  The Log for the 3rd Shift shows Chance did not leave his room and spent much of it lying down and sleeping. There is no notation affirming he received liquids or ate anything or took a shower.  Chance did none of the various "out-of-cell" activities on this day. [Exh. A, 82/156].

16.    There is no Log for the 1st Shift on the 3rd  though the medication log states that Chance received Risperdal at 9:15am.   The Log for the 2nd Shift shows Chance did not leave his room and spent much of it lying down and sleeping. There is no notation affirming he received liquids or ate anything or received any prescribed medications though the medication log states that Chance received Risperdal at 9:39pm.  [Exh. A, p. 83/156]. Further, on March 3, 2008, Clyce was talking at a time he was not permitted to do so during the staffs second shift. Officer Wright wrote an incident report detailing that it took him three times to restrain Clyce to get him into his cell for talking. Officer Wright then moved Clyce from his cell into a solitary confinement cell as punishment for talking, a violation of

facility policy. It was apparently used by staff for medical isolation and was also called room therapy. He was further placed on non program for medical complaints that day. Later that night a third shift employee found Clyce in solitary confinement with no mattress or bedding. The Log for the 3rd Shift shows Chance did not leave his room and spent much of it lying down and sleeping. There is no notation affirming he received liquids or ate anything or took a shower that day. Chance did none of the various "out-of-cell" activities on this day. [Exh. A, p. 84/156].

17.     The Log for the 1st Shift on March 4th shows Chance did not leave his room and spent much of it lying down. There is no notation affirming he received liquids or that he ate anything. without explanation the morning dose of the Respirdal stopped. [Exh. A, 52, 85/156]. The Log for the 2nd Shift again show Chance did not leave his room and spent much of it lying down and sitting. There is no notation affirming he received liquids but there is that he ate dinner. There is no notation that he received prescribed medications though the medication log states that Chance received Risperdal at 7:34pm. Detention Officer Reggie Washington notes that Chance is complaining about pain in his thigh. There is no previous similar report for any of his previous days at the facility. [Exh. A., p. 52/156]. A staff member even noted there was a problem with his gait in an incident report. [Exh. A, 86/156]. The Log for the 3rd Shift shows Chance did not leave his room and spent much of it lying down and sleeping. There is no notation affirming he received liquids or ate anything. Chance did none of the various "out-of-cell" activities on this day though he did take a shower. [Exh. A, 87/156]. There is evidence Detention Officers Watson and Searcy left messages in the logs asking for Chance to receive medical attention. It was apparently set for him to go on the 7th. Clyce complained that staff took away his mattress for no reason. An officer was so

surprised, that he left a notation that he has no bedding in his cell. [Exh. A, 127/156].

18.    The Log for the 1st Shift on March 5th shows Chance did not leave his room and spent much of it lying down.  There is no notation affirming he received liquids but he ate lunch. Detention Officer Davis notes that Chance is complaining about pain in his leg.  [Exh. A, 52, 88/156]. The Log for the 2nd Shift again show Chance did not leave his room and spent much of it lying down and sitting.   There is no notation affirming he received liquids but or that he ate something. There is no notation that he received prescribed medications though the medication log states that Chance received Risperdal at 7:56pm.  [Exh. A, 52, 89/156]. The Log for the 3rd Shift shows Chance did not leave his room and spent much of it lying down and sleeping. There is no notation affirming he received liquids or ate anything though he did take a shower.  Chance did none of the various "out-of-cell" activities on this day except for going to physical education during second shift. [Exh. A, 52, 90/156].

19.    The Log for the 1st Shift on March 6th shows Chance did not leave his room and spent much of it lying down.  There are a number of notations that he was screaming.  Lead Officer Searcy notes that Chance is complaining about his thigh feels like its out of place.  Clyce is in so much pain he is beating himself against the wall and banging the cell.  There is no notation affirming he received liquids or that he ate anything.  On the 6th a staff member tried to arrange for Chance to see a doctor but the Administrator Mark Zmolik refused to make the arrangements for Chance because he did not yet have medical insurance.  [Exh. A, 43, 52, 91, 125, 126/156].

20.    The Log for the 2nd Shift again show Chance did not leave his room and spent much of it lying down and sitting.   There is no notation affirming he received liquids but there is that he ate something. Lead Officer Moss notes that Chance is complaining about leg pain. She

passes on her concerns to Supervisor Farley. Farley does require the facility Health Services Supervisor to check on Chance. [Exh. A., p. 52]. There is a notation that he received prescribed medications, as the medication log states that Chance received Risperdal at 9:06pm. [Exh. A, 52, 92/156]. The Log for the 3rd Shift shows Chance did not leave his room and spent much of it lying down and sleeping. There is no notation in the log affirming he received liquids or ate anything though he did take a shower. Chance did none of the various "out-of-cell" activities on this day. [Exh. A, 52, 93/156]. There is nothing in that days notes, or anywhere for that matter, that Farley ever follows up.

21. The Log for the 1st Shift on March 7th shows Chance did not leave his room and spent much of it lying down. There is no notation affirming he received liquids. Some time in and around March 7th Clyce got in line with other children to receive medical attention, but was pulled out of line by staff and taken back to his cell. Detention Officer Washington removed Chance from all programs that day because his leg was hurting so much. He also refused lunch. [Exh. A, 53, 94/156]. The Log for the 2nd Shift again show Chance did not leave his room and spent much of it lying down and sitting. Lead Officer Searcy gave Chance an ice pack. There is no notation affirming he received liquids but there is that he ate something. There is a notation that he received prescribed medications as the medication log states that Chance received Risperdal at 9:08pm. [Exh. A, 53, 95/156]. The Log for the 3rd Shift shows Chance did not leave his room and spent much of it lying down and sleeping but that he did fall off his bed and mumbled incoherently through the night. There is no notation affirming he received liquids or ate anything though he did take a shower that day. Chance did none of the various "out-of-cell" activities on this day. [Exh. A, 53, 95/156]. His mother called to speak with her son but was told by staff he was unable to get up and do so. She

did provide staff his Medicaid number so he could go to the doctor. [Exh. A, 8, 33/156].

22.     The Log for the 1st Shift on March 8th shows Chance did not leave his room and spent much of it lying down.  He continues to be on "non-program."  There is no notation affirming he received liquids.  Detention Officer Carter wrote that Chance was unable to help in his hygiene and refused breakfast. [Exh. A, 53, 97/156].  For the Second Shift on the 8th Shanigia Williams came to the Detention Center and was Lead Officer.  The Log for the 2nd Shift again show Chance did not leave his room and spent much of it lying down and sitting except for a visit with his mother, at about 8:30pm. Detention Officer Bray took Chance from his cell for the visit.  She noticed he was walking very slowly.  Chance told her that he thought he hurt it by falling off his bed and that his hip was hurting whenever he moved it. She brought Chance to the visitation room to visit with his mother.  Chance was complaining "... I just need to go to the f...ing hospital." He was out of non-prescription pain medications. [Exh. A, 53, 98/156].

23.     Mother witnessed her son limping and bleeding from the mouth and nose.  he was lethargic and could barely speak.  She told Bray she was concerned that her son was not eating or drinking enough liquids.  Bray reported her concerns to Shift Supervisor Williams.  Mother began beating on the visitation window frantically demanding that Chance immediately be taken to the Emergency Room.  She then shared with Officer Williams her concerns about her son's injuries and failure to eat.  In response, mother remembers that Williams just "shrugged her shoulders."   Mother was so upset she called her daughter Jessia Stopke and asked her to visit also.  Williams called Supervisor Farley and explained Clyce's health related concerns and mother's demands.  Instead of making his own decision based upon the then current information from Williams he abdicated his responsibilities and asked Williams

to call the Ellis County Casemanager Catrina Johnson for advice.  He again fails to contact the facility's own Health Services Coordinator.  Johnson suggested the Hunt County Staff make the decision and they again chose to do nothing, [Exh. A, 8-9, 32, 33, 111/156] apparently because he and his mother were considered problems.  [Exh. A, 138/156].

24.     For most of the entire 2nd Shift on the 8th Chance was lying in his cell. There is no recordation of him consuming any fluids during this shift.  On the 8th the medical log also states that Chance received Risperdal at 9:32pm.  The room check log does not show he received prescribed medication.  [Exh. A, 98/156].  For most of the entire 3rd Shift on the 8th Chance was lying in his cell. There is no recordation of him consuming any fluids during this shift.  [Exh. A, 99/156].

25.     The Log for the 1st Shift on March 9th shows Chance did not leave his room and spent much of it lying down.  There is no notation affirming he received liquids but that he did eat. there was a Code Red during this shift and also that he fell.  Detention Officer Bray wrote that he refused breakfast and would not leave his cell for leisure activities.  Detention Officer Watson also noted that Chance had been crying out all night, in pain. Further, he did not eat but drank some juice.  They xcontinued to be out of pain medication. [Exh. A, 54, 100/156].

26.     Also that evening Williams returned to work and was again the Lead Officer for her shift. She learned that Chance had again refused his food tray. During her shift Chance did not leave his room and spent much of it lying down and sitting.   There is no notation that he drank anything but there is that he ate something. There is a notation that he received prescribed medications as the medication log states that Chance received Risperdal at 9:22pm.  He did not take a shower on that shift or during that day at all.  The Log for the 3rd Shift shows Chance did not leave his room and spent much of it lying down and sleeping but

that he did fall off his bed and mumbled incoherently through the night.  There is no notation affirming he received liquids or ate anything.  Chance did some "out-of-cell" activities on this day including physical education, a phone call, and a leisure period.  [Exh. A, 101-102/156].  Also on the 9th Jessica Stokes, Chance's sister called to speak with him and set up a visit. She learned his privileges had been taken away and was not able to leave his cell or take a phone call at that time.  The Officer she spoke with commented that Chance had been complaining about pain in his hip and wasn't leaving the cell because he was in so much pain. [Exh. A, p. 12/156]

27.    The Log for the 1st Shift on March 10th shows Chance did not leave his room and spent much of it lying down while there.  He had been crying all night.  There is no notation he received any liquids but that he did eat, as there was a concern he had not for a few days. [Exh. A, 32, 54, 103, 129/156]. The Log for the 2nd Shift again show Chance did not leave his room and spent much of it lying down and sitting.   There is no notation affirming he received liquids but there is that he ate something.  There is a  notation that he received prescribed medications as the medication log states that Chance received Risperdal at 8:31pm.  [Exh. A, 54, 104/156].  The Log for the 3rd Shift shows Chance did not leave his room and spent much of it lying down and sleeping but that he did fall off his bed and mumbled incoherently through the night.  There is no notation affirming he received liquids or ate anything though he did take a shower. Chance did none of the various "out-of-cell" activities on this day.   [Exh. A, 32, 54, 105/156].  Chance had told his mother he also complained about his jaw.  He was given Ibuprofin for a fractured arm.  [Exh. A, 32, 54, 128/156].

28.    The Log for the 1st Shift on March 11th shows Chance did not leave his room and spent

much of it lying down.  There is no notation affirming he received liquids but that he did eat.
Officer Dana Kennedy filed a report noting that Chance had been complaining for some time
about pain in his hip.  Additionally, she reported her concerns that Chance was groaning
throughout the night and still was not eating.  Also on the 11th, Detention Officer Lakendra
Hunter reported that Clyce had been complaining about his hip for many days and wrote that
he "... did look pretty bad."  [Exh. A, 54, 106, 130/156].  The Log for the 2nd Shift again
show Chance did not leave his room and spent much of it lying down and sitting.   There is
a notation affirming he received liquids twice but not that he ate something.  There is no
notation that he received prescribed medications.  [Exh. A, 107/156].

29.     That evening he was visited by his sister, Jessica Stokes at about 8:32pm.   She had spoken
        to her mother, about her visit to Chance and the facility and was equally concerned. She
        reports on her drive to the facility she called and spoke to a number of Detention Officers
        to assure she could still visit.  She again was told that Chance had his privileges taken away
        and had a bruised hip and was uncertain about visitation but decided to go anyway. When
        she arrived she was told that Chance did want to come out of his cell. She was very surprised
        and asked the Officer to speak with Chance again.  While waiting another parent came up
        to Jessica and commented that she had been there a few days before when Chance's mother
        was visiting. She though Chance looked extremely sick and deathly ill at that time. She
        remembered seeing mother bang on the glass and beg for her son to get treatment but the
        officer, Supervisor Williams, did not respond.  Finally, Chance arrived.  [Exh. A, 9, 12-13,
        110/156].

30.     Jessica saw her brother and was aghast.  She has likened his appearance to a person in a
        concentration camp in World War II.  He was obviously malnourished and had lost over 15

pounds and he was already a "stringbean" at 100 pounds.  He was unable to walk securely on his own and it some over thirty seconds just to sit.  He had dried blood coming out of his nose which apparently had not been cleaned since the visit with his mother, a few days prior. He also had a busted lip.  His jaw was obviously crooked and he could close his mouth fully. He was not strong enough to hold the visitation phone up to his ears and it took another thirty seconds or so for him to do so.   He could hardly talk but made a constant "whining" sound to deal with the pain.  His pupils were small and he could barely focus.  He was extremely disoriented.   She too pled with the Detention Officer Staff to take Chance for emergency medical treatment but they refused to do so.  Chance was in so much pain he had to cut the visit short.  He took along time to get up from the chair and his sister saw him limp off.  The sister's comments reinforce what mother equally observed three nights before. [Exh. A, 14-15/156].

31.      The medication logs shows he received the Risperdal at 9:10pm. The Log for the 3rd Shift shows Chance did not leave his room and spent much of it lying down and sleeping and mumbled incoherently through the night.  There is no notation affirming he received liquids or ate anything.  He did not take a shower that day.  Chance did none of the various "out-of-cell" activities on this day, save for the visit.  [Exh. A, 108/156].  On the overnight shift bridging the 11th to the 12th, Detention Officer Bray noted that Chance again refused breakfast.  He continued to moan and groan. The Log for the 1st Shift on March 12th shows Chance did not leave his room and spent much of it lying down until he left for Court.  There is no notation affirming he received liquids but that he did eat. He never returned to the Detention Center.  [Exh. A, 109, 130-131/156].

32.      For the most part, he never left his cell from about March 4th until March 12th.  He

consistently complained about being in pain and begged for medical care but got none in a timely manner.  The record reflects that during this period he did not consistently eat meals or have access to water or other beverages.  Nor did he shower much, and barely at all.  The "Room Check Log" has a specific place for staff to note for cleaning. It was notated only once over his entire stay. *Passim.*

33.     Sixteen days later after his admission to the Hunt County Detention Center on the 12th, Officers with the Ellis County Juvenile Detention Office picked him up to go to Court. One of the Officers was so concerned about Chance's appearance that he immediately spoke with one of the Supervisors with the Ellis County Juvenile program, Richard Aldama.  Aldama took one look at Clyce and observed Chance to be extremely weak, frail, very pale, slow and very lethargic.  He decided to immediately take him to an Emergency Room and bypass court for that day.  He also reported his concerns to Juvenile Judge Calvert. [Exh. A, 14, 24-/156].  Chance was taken to Baylor Emergency Room in  Waxahachie, Texas on the 13th.   The emergency room physician reported back to Aldama that Chance was severely dehydrated, that his heart rate was abnormally high and had bruising all over his body.  The medical staff had many questions about his treatment at the Hunt County Juvenile Detention Center.  [Exh. A, 10-11, 31/156].

34.     On Friday the 14th, he was then taken by ambulance to the Medical City Hospital in Dallas for further testing.  There were major concerns about Chance having pneumonia and blood infections.  He was taken again by ambulance  to the Cook's Children's Hospital in Fort Worth, where he stayed in the Intensive Care Unit and was intubated for about three weeks, with a total hospital stay of about three months.  When he entered the hospital Clyce had serious medical issues. These included, not being able to walk without help, inability to open

his mouth, dehydration, bruising all over his body, liver and kidney damage/failure, he stopped producing red blood cells, jaw pain, and nine of his joints had become septic from the MRSA. A lab report noted barbiturates in his blood even though he never was prescribed barbiturates by any previous medical professional he had seen. While there, Chance had to undergo six surgeries on his joints and two heart surgeries. [Exh. A, 10-11, 24-31/156; 2011 U.S. Dist. LEXIS 158605; at *2; 515 F. App'x 319, 321 (5th Cir. 2013).

35.     In 2009, he again needed heart surgery and over the course of time has required a hip replacement by Dr. Richard Buch in addition to several stem cell surgeries.  Clyce has since had major jaw surgery performed by Dr. Sinn in 2010 and was also required to have braces. Further, he has had three facet joint block injections, performed by Dr. Duclair,  for pain in his lower back and hip.   He now has Scoliosis, crooked hips, and must constantly take strong medication to combat the pain proscribed by Dr. Allan-Farrow Gillespie. [Exh. A, 15, 143-144/156; 515 F. App'x 319, 321 (5th Cir. 2013).

E.     THE STAFF WAS DELIBERATELY INDIFFERENT

36.     On the days that Shanigua Williams was present and directly supervising, the 8th and 9th, she had actual knowledge that he was isolated in his room and never left it.  They later gave it a term "being on non-program [Exh. A, 53, 97/156]" but in fact, he was isolated and left alone.  There is no, notation of him socializing with any one on the unit, eating normally, drinking normally, toileting or doing anything considered a normal daily behaviors.  When Chance did leave the cell and unit to visit his mother she actually awareness from her he was in dire medical need.  She received information from other staff and she herself observed Chance's debilitating health, fractured sleep patterns, inability to walk, eat, drink and converse, loss of weight and compromised mental state and did nothing.  She knew he had

required daily programs but did nothing to address his non-participation. Moreover, she was specifically asked by Mrs. Clyce to contact emergency medical services and she refused to do so.  She never even contacted the nurse for the facility.

37.   Farley knew about Chance's deteriorating medical and mental condition and failed to contact the facility Health Supervisor.  Williams and others informed him of Clyce's condition but failed to fulfill his supervisory duties.  [Exh. A, 141, 134-135/156].  Clyce complained over and over that he was sick, thirsty and in pain.  His room had a puddle of water in it for days. He had no mattress. He had no bedding.  Apparently he and his mother had complained so much that Farley and others had turned a deaf ear and blind eye.  Farley also did not ever contact the nurse for the facility to visit Chance, an easy fix.[Exh. A., p. 5-6, 135/156].

38.   On March 3rd Chance was seen by his regular psychiatrist [Exh. A, 52/156].  From that day forward, even though he was not eating or drinking, or interacting with anyone on the unit and was staying by himself in his cell, ot participating in normal daily hygenic activities, or going to school or having any physical educational outlet, neither Williams nor Farley or anyone for that matter referred him to his psychiatrist for a follow up appointment or consult.  The log has a place to see a counselor (#25) but that never, ever occurs with Chance. By the time he goes to Juvenile Court on March 12th, not only has Chance deteriorated medically but it was self-evident he was "in dire need to ...mental health attention" and was being referred to a residential treatment facility for an emergency mental health commitment.  [Exh. A, 109, 30-31/156].   The Juvenile Detention Center had an expert report completed [*see* Exh. C, Case 3:90-cv-00351-N, DE# 61-4, p. 4/40 Affidavit of Steven Robinson] that is devoid of any mention that Clyce received necessary nursing, psychiatric, psychological or mental health treatment or counseling, or modification of his

psychoactive medication regime, even though it was self-evident that such care should have been provided. No affidavit provided by any Detention Center employee refutes Clyce's contention staff failed to provide him any nursing care or mental health services.

## VI. <u>STANDARD FOR REVIEW</u>

A.    RULE 4(m)

39.    Plaintiff accepts Defendant Farley's rendition of the Rule 4(m) *Motion* but notes he has good cause for not serving Farley's Estate, as unless the Court denies the Motion For Summary Judgment filed in his favor, there is no reason to upset his family.

B.    RULE 56 MOTION FOR SUMMARY JUDGEMENT

40.    Plaintiff accepts Defendants of the stndards for review for Rule 56 *Motion For Summary Judgment.*

## VII. <u>ARGUMENT AND AUTHORITIES</u>

41.    Plaintiff incorporates by reference all the above related paragraphs, as well as those below, with the same force and effect as if herein set forth.

42.    Clyce abandons all the constitutional claims noted in his *Amended Complaint* [DE# 99] save for those he construed as *Cruel And Unusual Punishment,* the *Failure To Provide Medical Services* and as to both, and overall violations of his right to Due Process pursuant to the 14th Amendment to the United States Constitution.

A.    STANDARDS OF REVIEW FOR QUALIFIED IMMUNITY

43.    Qualified immunity protects government officials from civil liability if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Its aim is to harmonize the need to hold public officials accountable when they exercise power irresponsibly with the need to shield officials from harassment,

distraction, and liability when they perform their duties reasonably. The defense protects all but the plainly incompetent or those who knowingly violate the law. Two inquiries ensure its aim. First, a plaintiff must show an actor violated a constitutional right; second, the plaintiff must prove that the violated right was clearly established at the time of the alleged misconduct. The appellate court can decide one question or both in reviewing a judgment based on qualified immunity.  Under the 8th Amendment, inadequate inmate medical care may rise to such  violation, but to do so, a prison official must act with deliberate indifference to the serious medical needs of a prisoner meaning the officer must know of the existence of a serious medical need, the official's subjective knowledge of the risk of failing to meet that need, and that the official disregarded that risk by failing to take reasonable measures to abate it.  While a state-custody convicted prisoner's constitutional rights emanate from the 8th  Amendment's guarantee against cruel and unusual punishment, a pretrial detainee's rights, like Clyce, arise from the *Due Process* guarantees of the Fourteenth Amendment.  <u>Rombach v. Culpepper</u>, 2021 U.S. App. LEXIS 20713 (5th Cir. 2021).

44.   Under the qualified immunity analysis, a right is "clearly established" if the contours of that right are so sufficiently clear that a reasonable official would understand what he is doing violates that right. The chief focus of the second element of the test is to ensure that before they are subjected to suit, officers are on notice that their conduct is unlawful. There are two ways a plaintiff may show that an alleged right is clearly established. First, the plaintiff may identify a case or body of relevant case law in which an officer acting under similar circumstances was held to have violated the Constitution. This approach does not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate. Alternatively, the plaintiff may demonstrate that the unlawfulness

of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances. Id. at * 8-9. Here, Clyce an show that Farley and Williams violated his right to be free from unnecessary solitary confinement, the right to receive necessary medical treatment and in addition and in the alternative, the right to mental health treatment

45.   Importantly, Farley can be held responsible under a theory of Supervisory Liability, if there is evidence he failed to sufficiently supervise staff and the failure to do cause the injuries to which Clyce complains. Thompson v. Upshur County, 245 F.3d 447, 459 (5th Cir. 2001). Here Chance provides significant summary judgement evidence, actually uncontested that Farley failed to follow up on any conversations he had with Williams or anyone else for that matter, about Chance's deteriorating condition. As such, Chance continues below alleging liability as to both Farley and Williams for the violations and their joint deliberate indifference, as noted herein.

A.   THE DEFENDANTS WERE DELIBERATELY INDIFFERENT TO CLYCE'S NEED FOR MEDICAL CARE

46.   In Rombach the Panel relied upon Rodrigue v. Grayson, 557 Fed. Appx. 341, 346 (5th Cir. 2014) to help determine whether or not a prison official was able to rely upon the *Qualified Immunity Affirmative Defense* and in that case, could not because of the "the continuous and intense nature of Rodrigue's complaints of vomiting and abdominal pain... ." Further, that both appellants had subjective knowledge that Rodrigue's medical condition carried significant risks of serious injury. Especially important to the Panel was not only was the medial condition apparent but it was claerly worsening. The Panel, found that in in accepting these facts as true as it must, no reasonable person would have thought it constitutionally permissible to deny him the medical care Rodrigue required. Id. at 344-345. Taken

together, the Panel found that the Appellant had both a constitutional right to medical treatment, *see also* <u>Thompson</u> at 463 [... Clearly established law forbids a significantly exacerbating delay or a denial of medical care to a detainee] and that the right was clearly established at that time.

47.   Here both Farley and Williams both failed to assure that Chance was ever seen by a nurse at the facility.  They both failed to assure that Chance was seen by a dietician even though he wasn't eating.   They failed to assure Chance was seen by the facility's *Health Care Services Supervisor* even though it is absolutely self-evident he should have been.  As Chance has provided substantial summary judgment evidence that each Defendant was deliberately indifferent to him, the Court should deny Defendants' *Motion For Summary Judgment* and reliance upon the *Qualified Immunity Defense.*  Farley is particularly responsible because the record reflects Clyce wasn't given timely medical care because he didn't have evidence of insurance coverage.

B.   THE DEFENDANTS WERE DELIBERATELY INDIFFERENT TO CLYCE'S NEED FOR MENTAL HEALTH CARE

48.   Clyce incorporates the argument and authority section above as it equally pertains to mental health care.   In addition and in the alternative to the above, the record is clear that when Chance entered the juvenile detention center he had a long history of both behavioral and emotionally based   mental health problems. The record reflects he was receiving psychoactive medications for his emotional problems for a significant period of time.  The Juvenile Services program had him see a counselor yet even though he stopped eating, drinking, taking care of his daily needs and never leaving his cell, neither Farley or Williams ever contacted his psychiatrist or psychologist to address his then emerging and worsening

mental health needs.   Neither sough to have his psychoactive medication needs adjusted.

Nether contacted his counselor to visit.   Neither contact the facility nurse to complete a

mental health assessment.   Again, nether contacted the *Health Care Services Supervisor*

even though, once again, it is absolutely self-evident that either or both should have.   The

failure to do so, at any time after Clyce began evidencing these very serious symptoms,

which was after the very first days, clearly rise to the level of deliberate indifference.   Hope

v. Harris, 2021 U.S. App. LEXIS 18294 at *18 (5th Cir. June 18, 2021) *citing* Wilson v.

Seiter, 501 U.S. 294, 298, 302, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991)[evidence of

violation of the 8th Amendment when failing address detainee mental health needs].

49.     As Chance has provided substantial summary judgment evidence that each Defendant was

deliberately indifferent to his mental health needs, the Court should deny Defendants'

*Motion For Summary Judgment* on this claim as well as to the one above.

C.     THE DEFENDANTS WERE DELIBERATELY INDIFFERENT BY UNNECESSARILY
       ISOLATING CLYCE

50.     In addition and in alternative to the above, Clyce claims his constitutional right to free from

unnecessary and excessive restraint or seclusion was also violated by the Defendants.   Aside

from writing that Clyce could not have such a cliam, they provide no caselaw in support of

this proposition.   Accordingly, it is waived.   PlainsCapital Bank v. Keller Independent

School District, 746 F. App'x 335, 363 (5th Cir. 2018); *see also* Audler v. CBC Innovis Inc.,

519 F.3d 239 (5th Cir. 2008)["A party waives an issue if he fails to adequately brief it."].

That being said, Clyce will nevertheless address this separate claim.

51.     Assuming for a moment that the Court finds the Defendants' *Motion For Summary Judgment*

as to medical or mental health care, well-taken the Court is left to determine what other

reason could have possible existed to keep Clyce secluded in solitary confinement for his entire stay at the facility.  There is none.  The sole justification for confinement pretrial is to assure attendance at trial; therefore, pretrial detainees cannot constitutionally be subjected to any hardships except those absolutely necessary to ensure their continued confinement. Jones v. Diamond, 594 F.2d 997, 1020, 1034 (5th Cir. 1979); *see also* Hope v. Harris, 2021 U.S. App. LEXIS 18294 at *17 (5th Cir. June 18, 2021).  Here Clyce was kept in his cell for almost two weeks without any cause except for an occasional note he was on "Room Therapy."  It was apparently the only therapy he received while at the facility.  As Clyce has provided competent summary judgment evidence in support of the claim he was unconstitutionally secluded, the Defendants *Motion For Summary Judgement* as to this claim must also be denied.

52.

## CONCLUSION AND PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff prays the *Motion For Summnary Judgment* be denied as to each Defendant, or alternatively as to one and not the other, that if necessary, Plaintiffs be permitted leave of court to serve the Estate of Farley, and for such other relief as this Court deems may deem just and proper whether at law, or at equity or both.

Respectfully submitted,

By: /s/ Martin J. Cirkiel
    Mr. Martin J. Cirkiel, Esq.
    Marty@cirkielaw.com [Email]
    State Bar No. 00783829

CIRKIEL LAW GROUP, P.C.
f/n/a Cirkiel & Associates, P.C.
1901 E. Palm Valley Blvd.

Round Rock, Texas 78664
(512) 244-6658 [Telephone]
(512) 244-6014 [Facsimile]
ATTORNEYS FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that, on this the ___ day of October, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF system, which will send electronic notification of such filing to the following:

Mr. J. Eric Magee, Attorney & Counselor at Law
Allison, Bass & Magee, LLP
A.O. Watson House
402 W. 12th Street
Austin, Texas 78701
(512) 482-0701 [Telephone]
(512) 480-0903 [Facsimile]
e.magee@allison-bass.com [Email]
Attorneys for Defendants

/s/ - Martin J. Cirkiel     
Martin J. Cirkiel, Esq.
