IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CHANCE CLYCE,                          §
                                       §
            Plaintiff,                 §
                                       §
V.                                     §        No. 3:15-cv-793-S-BN
                                       §
FREDERICK FARLEY, KENNETH              §
WRIGHT, and SHANIGIA WILLIAMS,         §
                                       §
            Defendants.                §

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE**

Following remand from the United States Court of Appeals for the Fifth

Circuit, *see Clyce v. Farley*, 836 F. App'x 262 (5th Cir. 2020), United States District

Judge Karen Gren Scholer re-referred this case to the undersigned United States

magistrate judge for pretrial management under 28 U.S.C. § 636(b), *see* Dkt. No. 82.

The parties attempted to settle. *See* Dkt. Nos. 83-89, 91. And, coinciding with

their efforts, counsel for Defendant Frederick Farley filed a suggestion of death. *See*

Dkt. No. 90.

After the parties were unable to settle, the Court granted Plaintiff Chance

Clyce leave to file a first amended complaint (the FAC) against Farley and

Defendants Kenneth Wright and Shanigia Williams, all in their individual capacities,

*see* Dkt. Nos. 98 & 99, through which Clyce alleges that each defendant violated his

rights protected by the First, Fourth, Eighth, and Fourteenth Amendments to the

United States Constitution, *see* Dkt. No. 99 at 18-22. Wright and Williams answered,

asserting qualified immunity. *See* Dkt. No. 101, ¶ 16.

The Court therefore required that each move for summary judgment on qualified immunity, *see* Dkt. No. 103, to allow the Court to consider their actions separately, *see Meadours v. Ermel*, 483 F.3d 417, 421-22 (5th Cir. 2007), on an expedited basis, *see Ramirez v. Guadarrama*, 3 F.4th 129, 133 (5th Cir. 2021) (per curiam).

Wright and Williams, represented by the same counsel (who also has represented Farley), moved for summary judgment on qualified immunity, and Defendants further moved for dismissal of the claims against Farley under Federal Rules of Civil Procedure 25(a) and 4(m). *See* Dkt. No. 104.

After Clyce failed to respond to the Court's order allowing him an opportunity to move for leave to conduct limited discovery in order to respond to the assertions of qualified immunity, *see* Dkt. Nos. 105-07, the Court required briefing on the pending motion, *see* Dkt. No. 108. Clyce responded. *See* Dkt. No. 111. And Wright and Williams replied. *See* Dkt. No. 112.

The undersigned now enters these findings of fact, conclusions of law, and recommendation that the Court should grant the pending motion insofar as the Court should dismiss the claims against Farley with prejudice under Federal Rule of Civil Procedure 25(a) and enter summary judgment on Wright's and Williams's assertions of qualified immunity, dismissing the claims against them with prejudice.

## Applicable Background

Although this lawsuit began in 2014, when Clyce (by then an adult) and his parents filed a *pro se* lawsuit in the Western District of Texas that included claims

against Farley, Wright, and Williams, the facts before the Court – at least the version

on which Clyce relies to oppose summary judgment – are drawn from the 2009 lawsuit

filed by Clyce's parents on his behalf with the assistance of counsel. *See* Dkt. Nos.

111-1, 111-2, 111-3, 111-4, 111-5, 111-6.

> In 2009, Donna and Mark Clyce, individually and as next friends
> of their minor son Chance, filed suit in the Northern District of Texas
> against Hunt County, Texas; Hunt County Juvenile Board (Board);
> Chief Juvenile Probation Officer James A. Brown; Detention Officer
> Anthony Searcy; Detention Officer Tina Jobe; Detention Officer Davis;
> Detention Officer Williams; and other unknown Detention Officers
> employed at the Detention Center. The Clyces alleged that the
> defendants were liable under 42 U.S.C. § 1983 for violating Chance's
> Fourteenth Amendment due process right to reasonable medical care,
> and that Hunt County and the Board were liable under the Texas Tort
> Claims Act for misusing property that caused Chance's injuries. The
> district court granted summary judgment in favor of Brown, Searcy, and
> Jobe on qualified immunity grounds. It also granted summary judgment
> in favor of Hunt County and the Board because the Clyces failed to
> provide sufficient evidence to support their § 1983 and tort claims. The
> district court dismissed without prejudice the claims against the
> remaining defendants, who were not timely and properly served. [The
> Fifth Circuit] affirmed the district court's decision.

*Clyce*, 836 F. App'x at 264-65 (citing *Clyce v. Hunt Cnty.*, 515 F. App'x 319, 321 (5th

Cir. 2013) (per curiam)).

The Clyces did not appeal the 2011 dismissal of the claims against Brown,

Searcy, and Jobe based on qualified immunity, *see Clyce*, 515 F. App'x at 322, which

dismissals occurred after the Clyces failed to controvert the defendants' evidence

contradicting their allegations, *see Clyce v. Hunt Cnty., Tex.*, No. 3:09-cv-351-N, Dkt.

No. 42 at 6-7, 8 (N.D. Tex. Aug. 24, 2010) (Jobe and Searcy "submit evidence that

directly contradicts Plaintiffs' allegation that they acted with deliberate indifference.

Plaintiffs offer no controverting evidence. Thus, they fail to establish a genuine issue

of material fact that Jobe and Searcy acted with deliberate indifference. Because Plaintiffs cannot meet their burden to show that Jobe and Searcy are not entitled to qualified immunity, the Court grants summary judgment in favor of Jobe and Searcy…. Again, Plaintiffs offer no controverting evidence. Thus, they fail to establish a genuine issue of material fact that Brown failed to supervise and train subordinate officials and that such failure was causally connected to a deprivation of Clyce's constitutional rights. Because Plaintiffs cannot meet their burden to show that Brown is not entitled to qualified immunity, the Court grants summary judgment Brown's favor.").

## Legal Standard and Analysis

I.      The Court should dismiss the claims against Farley with prejudice under Federal Rule of Civil Procedure 25(a).

Counsel for Farley filed a suggestion of Farley's death on April 14, 2021, *see* Dkt. No. 90, prior to Clyce's filing the FAC on June 7, 2021, *see* Dkt. No. 99.

The Federal Rules of Civil Procedure provide that,

> [i]f a party dies and the claim is not extinguished, the court may order substitution of the proper party. A motion for substitution may be made by any party or by the decedent's successor or representative. If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed.

FED. R. CIV. P. 25(a)(1).

An older version of this rule "functioned as a statute of limitations which resulted in a dismissal with prejudice." *McGrew v. BP Expl. & Prod., Inc.*, No. 1:19-cv-499-TFM-MU-C, 2021 WL 2013050, at *5 (S.D. Ala. May 20, 2021) (citing *Anderson v. Yungkau*, 329 U.S. 482, 485-86 (1947)). But "the 1963 amendments to

the federal rules liberalized substitution after death." *Id.* (citing 7C CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1955 (3d ed. 2007)). And "a court is no longer required to dismiss with prejudice under Rule 25(a)." *Id.* (collecting cases).

In fact, "the ninety-day period may be extended" under Federal Rule of Civil Procedure 6(b), "which provides that a district court 'for cause shown may at any time in its discretion ... upon motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect.'" *Yazdchi v. Am. Honda Fin. Corp.*, No. 3:05-cv-737-L, 2006 WL 2456495, at *3 n.2 (N.D. Tex. Aug. 23, 2006) (quoting *Cont'l Bank, N.A. v. Meyer*, 10 F.3d 1293, 1297 (7th Cir. 1993)); *accord Hill v. First Tenn. Bank, N.A.*, No. 3:17-cv-1298-L, 2018 WL 2427146, at *2 (N.D. Tex. May 30, 2018) ("Courts have applied Rule 6(b)(1) to requests for extensions of time to file motions to substitute under Rule 25." (collecting cases)); *see also Zanowick v. Baxter Healthcare Corp.*, 850 F.3d 1090, 1095-96 (9th Cir. 2017) ("The rule, its history, and the courts applying it for more than 50 years make clear that dismissal with prejudice under these circumstances is not mandatory – either a dismissal without prejudice or an extension of the 90-day deadline are discretionary options for the district court.").

In answer to the argument that the claims against Farley should now be dismissed under Rules 25(a) and 4(m), *see* Dkt. No. 104 at 8; Dkt. No. 112 at 5-6, Clyce contends that "he has good cause for not serving Farley's Estate, as unless the Court denies the Motion for Summary Judgment filed in his favor, there is no reason

to upset his family," Dkt. No. 111 at 22.

But, as the cases above demonstrate, excusable neglect – not good cause – is the standard applicable to attempts to substitute a party more than 90 days after service of the suggestion of death. These standards are not interchangeable. *See, e.g.*, FED. R. APP. P. 4 advisory committee's note, 2002 Amendments, Subdivision (a)(5)(A)(ii) ("The good cause and excusable neglect standards have 'different domains.' They are not interchangeable, and one is not inclusive of the other." (quoting *Lorenzen v. Employees Ret. Plan*, 896 F.2d 228, 232 (7th Cir. 1990))).

Regardless, Clyce never filed a motion to substitute nor moved to extend the time to do so, even after Defendants filed the dispositive motion now before the Court. The Court should dismiss the claims against Farley with prejudice for this reason alone. And, if the Court elects to construe Clyce's response to the dispositive motion as itself a motion under Rule 6(b)(1)(B), the Court should deny such a construed motion and still dismiss the claims against Farley with prejudice.

As to excusable neglect, "[a] more structured and exacting analysis is appropriate where a party seeks protection from his own negligence; where a litigant is the victim of unforeseeable circumstances, however, justice permits greater discretion." *Price v. General Cable Indus., Inc.*, 466 F. Supp. 2d 610, 613 (W.D. Penn. 2006). Thus, a court's determination as to excusable neglect

> is at bottom an equitable one, taking account all of the relevant circumstances surrounding the party's omission. These include ... the danger of prejudice ..., the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.

*Stotter v. Univ. of Tex. at San Antonio*, 508 F.3d 812, 820 (5th Cir. 2007) (quoting *Midwest Employers Cas. Co. v. Williams*, 161 F.3d 877, 879 (5th Cir. 1998) (quoting, in turn, *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)); internal quotation marks omitted).

The explanation for why Clyce has not moved for substitution – "unless the Court denies the Motion for Summary Judgment filed in [Farley's] favor, there is no reason to upset his family" – does not tip the equities in his favor.

First, Farley never moved for summary judgment on qualified immunity, so whether qualified immunity attaches to his actions is not before the Court. To bring it before the Court at this stage would require a response on his behalf to the FAC, which would at least require a motion to substitute. So, assuming Clyce wants to continue with Farley as a defendant, Clyce's own negligence (his failure to move to substitute) is why the Court cannot address Farley's actions in relation to qualified immunity at this time. Consequently, Clyce's omission negatively impacts this proceeding – if Farley's estate was to be served and respond asserting qualified immunity, it would result in qualified immunity round two. And Clyce's reason for delay, completely in his control, was not reasonable.

Further, an obituary for Farley available online indicates that he died in 2017. *See* https://jcwhitefd.com/book-of-memories/3486012/farley-frederick/obituary.php (including condolences from people who worked with Farley at Hunt County's juvenile detention center; last visited Jan. 25, 2022); *Perez v. Steele*, No. 5:17-cv-113-BQ, 2018 WL 10323027, at *3 n.1 (N.D. Tex. Jan. 31, 2018) (taking judicial notice of

an online obituary after suggestion of death filed; citing FED. R. EVID. 201(c)(1);
collecting cases). Considering that Farley died more than four years ago, the
amendments establishing the current version of Rule 25(a) also support the denial of
any construed motion under Rule 6(b)(1)(B) that Clyce may make at this time.

> A motion to substitute made within the prescribed time will
> ordinarily be granted, but under the permissive language of the first
> sentence of the amended rule ("the court may order") it may be denied
> by the court in the exercise of a sound discretion if made long after the
> death – as can occur if the suggestion of death is not made or is delayed
> – and circumstances have arisen rendering it unfair to allow
> substitution. *Cf. Anderson*, 329 U.S. at 485, 486, where it was noted
> under the present rule that settlement and distribution of the estate of
> a deceased defendant might be so far advanced as to warrant denial of
> a motion for substitution even though made within the time limit
> prescribed by that rule. Accordingly, a party interested in securing
> substitution under the amended rule should not assume that he can rest
> indefinitely awaiting the suggestion of death before he makes his motion
> to substitute.

FED. R. CIV. P. 25(a) advisory committee's note, 1963 Amendments.

II.    The Court should grant Wright and Williams qualified immunity on
<u>summary judgment and dismiss the claims against them with prejudice.</u>

   A.    **To defeat a public official's good-faith assertion of qualified
         immunity on summary judgment, the plaintiff's version of
         the disputed facts supported by evidence must show that
         the official's actions violated a clearly established
         constitutional right.**

"A plaintiff makes out a § 1983 claim if he 'shows a violation of the Constitution
or of federal law, and then shows that the violation was committed by someone acting
under color of state law,'" *Rich v. Palko*, 920 F.3d 288, 293-94 (5th Cir. 2019) (cleaned
up; quoting *Brown v. Miller*, 519 F.3d 231, 236 (5th Cir. 2008)).

"But government officials performing discretionary duties" can respond to such
a claim by asserting qualified immunity. *Id.* at 294 (citing *Haverda v. Hays Cnty.*, 723

F.3d 586, 598 (5th Cir. 2013)).

If they do, a court must consider each official's actions separately, *see Meadours*, 483 F.3d at 421-22, on an expedited basis, *see Ramirez*, 3 F.4th at 133 ("Because qualified immunity is an *immunity from suit*, not merely a defense to liability, 'it is effectively lost if a case is erroneously permitted to go to trial.' It is for this reason that a denial of qualified immunity is immediately appealable and that a defendant's entitlement to qualified immunity should be determined at the earliest possible stage of the litigation. This scheme prevents a defendant entitled to immunity from being compelled to bear the costs of discovery and other pre-trial burdens." (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); citations omitted)).[1]

> [T]he doctrine of qualified immunity attempts to balance two competing societal interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." These interests are distilled into a legal standard, an affirmative defense, that shields public officials sued in their individual capacities "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

*Joseph v. Bartlett*, 981 F.3d 319, 328 (5th Cir. 2020) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009), then *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Phrased differently, this immunity "attaches when an official's conduct 'does

---

[1] *See also Arnold v. Williams*, 979 F.3d 262, 267 (5th Cir. 2020) ("[B]ecause qualified immunity is 'not simply immunity from monetary liability' but also 'immunity from having to stand trial,' there is an interest in qualified immunity entering a lawsuit 'at the earliest possible stage of litigation.'" (quoting *Westfall v. Luna*, 903 F.3d 534, 542 (5th Cir. 2018) (quoting, in turn, *Brown v. Glossip*, 878 F.2d 871, 874 (5th Cir. 1989)))).

not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)).

The doctrine therefore "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (per curiam) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011); internal quotation marks omitted); *accord City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015). "'Accordingly, "qualified immunity represents the norm," and courts should deny a defendant immunity only in rare circumstances.'" *Angulo v. Brown*, 978 F.3d 942, 949 (5th Cir. 2020) (quoting *Romero v. City of Grapevine*, 888 F.3d 170, 176 (5th Cir. 2018) (quoting, in turn, *Harlow*, 457 U.S. at 807)); *but see, e.g.*, *Jamison v. McClendon*, 476 F. Supp. 3d 386 (S.D. Miss. 2020) (calling for reconsideration of the doctrine); *Hoggard v. Rhodes*, 141 S. Ct. 2421, 2422 (2021) (Thomas, J., statement respecting denial of cert.) (calling on his colleagues to, "in an appropriate case" "reconsider either our one-size-fits-all test or the judicial doctrine of qualified immunity more generally").

The "qualified-immunity inquiry is two-pronged." *Cunningham v. Castloo*, 983 F.3d 185, 190 (5th Cir. 2020) (citing *Garcia v. Blevins*, 957 F.3d 596, 600 (5th Cir. 2020)).

- Do "the facts, viewed in the light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional right"? *Id.* at 190-91 (citing *Garcia*, 957 F.3d at 600)

- Was "the right at issue [] 'clearly established' at the time of the alleged

misconduct"? *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019) (cleaned up; quoting *Pearson*, 555 U.S. at 232).

"In order for a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Ramirez*, 3 F.4th at 133 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "The reasonableness of the official's conduct and the degree to which the particular right in question was clearly established are thus merged into one issue for purposes of the qualified immunity analysis." *Id.* at 133-34; *cf. Nerio v. Evans*, 974 F.3d 571, 575 (5th Cir. 2020) ("Fair notice requires clearly established law. That is, the law must 'clearly prohibit the officer's conduct in the particular circumstances before him' so 'every reasonable official' knows not to engage in that conduct." (quoting *D.C. v. Wesby*, 138 S. Ct. 577, 590 (2018); citing *al-Kidd*, 563 U.S. at 742)).

Under this standard, "'[q]ualified immunity is justified unless no reasonable officer could have acted as [the defendant officers] did here, or every reasonable officer faced with the same facts would not have [acted as the defendant officers did].'" *Tucker v. City of Shreveport*, 998 F.3d 165, 174 (5th Cir. 2021) (quoting *Mason v. Faul*, 929 F.3d 762, 764 (5th Cir. 2019) (citing, in turn, *Wesby*, 138 S. Ct. at 590 ("It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. Otherwise, the rule is not one that 'every reasonable official' would know.")).

A court may "'analyze the prongs in either order or resolve the case on a single prong.'" *Cunningham*, 983 F.3d at 191 (quoting *Garcia*, 957 F.3d at 600). But

addressing this affirmative defense on a motion for summary judgment is not exactly intuitive.

"A plaintiff suing for a constitutional violation has the ultimate burden to show that the defendant violated a constitutional right … whether or not qualified immunity is involved." *Joseph*, 981 F.3d at 329 (footnote omitted).

But, "[w]hen a public official makes 'a good-faith assertion of qualified immunity,' that 'alters the usual summary-judgment burden of proof, shifting it to the plaintiff to show that the defense is not available.'" *Id.* at 329-30 (quoting *Orr v. Copeland*, 844 F.3d 484, 490 (5th Cir. 2016)); *accord Batyukova v. Doege*, 994 F.3d 717, 724 (5th Cir. 2021) ("The defense of qualified immunity 'alters the usual summary judgment burden of proof.' Once a defendant properly raises the defense, the burden shifts to the plaintiff to demonstrate that the defendant is not entitled to the defense's protection." (citations omitted)). "In other words, to shift the burden to the plaintiff, the public official need not show (as other summary-judgment movants must) an absence of genuine disputes of material fact and entitlement to judgment as a matter of law." *Joseph*, 981 F.3d at 330 (citing *King v. Handorf*, 821 F.3d 650, 653-54 (5th Cir. 2016)).

Once shifted, "the plaintiff bears the burden of demonstrating that a defendant is not entitled to qualified immunity." *Valderas v. City of Lubbock*, 937 F.3d 384, 389 (5th Cir. 2019) (per curiam) (citation omitted). And, "[t]o rebut [a public official's] qualified immunity defense, a plaintiff must point to summary judgment evidence '(1) that [the official] violated a federal statutory or constitutional right and (2) that the

unlawfulness of the conduct was 'clearly established at the time.'" *Cloud v. Stone*, 993 F.3d 379, 383 (5th Cir. 2021) (cleaned up).

As to the first prong of the qualified-immunity inquiry, to overcome a public official's motion for summary judgment on qualified immunity, the plaintiff "must show that there is a genuine dispute of material fact and that a jury could return a verdict entitling the plaintiff to relief for a constitutional injury" – just as would be required "if the plaintiff did not face qualified immunity." *Joseph*, 981 F.3d at 330. That is, the plaintiff must defeat summary judgment by showing that "the facts, viewed in the light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional right," *Cunningham*, 983 F.3d at 190-91.

When considering this showing, the Court must "accept the plaintiff's version of the facts (to the extent reflected by proper summary judgment evidence) as true." *Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 655 (5th Cir. 2004). But the Court need not do so if the plaintiff's "version 'is blatantly contradicted by the record, so that no reasonable jury could believe it.'" *Joseph*, 981 F.3d at 325 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007); citing *Orr*, 844 F.3d at 590).

When accepting the plaintiff's well-supported version of the disputed facts, the Court must "view the facts and draw reasonable inferences in the light most favorable to" the plaintiff. *Id.* (footnote omitted). And, particularly applicable in *pro se* cases, "verified complaint[s] and other verified pleadings serve as competent summary judgment evidence." *Falon v. Holly*, 480 F. App'x 325, 326 (5th Cir. 2012) (per curiam) (citing *Hart v. Hairston*, 343 F.3d 762, 765 (5th Cir. 2003)); *see, e.g.*, *Mitchell v.*

*Cervantes*, 453 F. App'x 475, 477-78 (5th Cir. 2011) (per curiam).

But "the plaintiff's version of those disputed facts must also constitute a violation of clearly established law." *Joseph*, 981 F.3d at 330. So, "when qualified immunity is involved, at least in this circuit, a plaintiff has the additional burden to show that the violated right was 'clearly established' at the time of the alleged violation." *Id.* at 329 (footnote omitted).

And "[t]he 'clearly established' prong is difficult to satisfy." *Cunningham*, 983 F.3d at 191; *see also Cope v. Cogdill*, 3 F.4th 198, 204 (5th Cir. 2021) ("We are bound by the restrictive analysis of 'clearly established' set forth in numerous [United States] Supreme Court precedents.").

The plaintiff "must show that the law was 'sufficiently clear' at that time 'that every reasonable official would have understood that what he [was] doing violate[d] that right.'" *Batyukova*, 994 F.3d at 726 (quoting *Mullenix*, 577 U.S. at 11). And "[t]here are two ways to demonstrate clearly established law" and meet this additional burden to make this second showing. *Id.*

The first approach "requires the plaintiff to 'identify a case' – usually, a 'body of relevant case law' – in which 'an officer acting under similar circumstances ... was held to have violated the [Constitution]," *Joseph*, 981 F.3d at at 330 (footnote omitted); *accord Wigginton v. Jones*, 964 F.3d 329, 335 (5th Cir. 2020) (A clearly established right must be supported by "'controlling authority – or a "robust consensus of [cases of] persuasive authority" – that defines the contours of the right in question with a high degree of particularity.'" (quoting *Morgan v. Swanson*, 659

F.3d 359, 371-72 (5th Cir. 2011))); *see also Lincoln v. Turner*, 874 F.3d 833, 850 (5th Cir. 2017) ("While we may look to other circuits to find clearly established law, we must consider 'the overall weight' of such authority. A 'trend' alone is just that. As of December 2013, only two circuits had weighed in on the 'contours of the right.' These cases alone do not provide sufficient authority to find that the law was clearly established." (footnote omitted)).

"It is the plaintiff's burden to find a case in [her] favor that does not define the law at a 'high level of generality.'" *Bustillos v. El Paso Cnty. Hosp. Dist.*, 891 F.3d 214, 222 (5th Cir. 2018) (cleaned up; quoting *Vann v. City of Southaven*, 884 F.3d 307, 310 (5th Cir. 2018) (quoting, in turn, *Cass v. City of Abilene*, 814 F.3d 721, 733 (5th Cir. 2016))). Thus, the "clearly established law" "must be 'particularized' to the facts of the case." *Roque v. Harvel*, 993 F.3d 325, 335 (5th Cir. 2021) (cleaned up; quoting *White*, 137 S. Ct. at 552 (quoting, in turn, *al–Kidd*, 563 U.S. at 742)). And a clearly established right must be defined "'with specificity.'" *Cunningham*, 983 F.3d at 191 (quoting *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curiam)).

"This rule is a 'demanding standard.'" *Id.* (quoting *Wesby*, 138 S. Ct. at 589). And "'[a]bstract or general statements of legal principle untethered to analogous or near-analogous facts are not sufficient to establish a right 'clearly' in a given context; rather, the inquiry must focus on whether a right is clearly established as to the specific facts of the case.'" *Nerio*, 974 F.3d at 575 (quoting *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015)).

"While there need not be 'a case directly on point,' the unlawfulness of the

challenged conduct must be 'beyond debate.'" *Joseph*, 981 F.3d at 330 (footnotes omitted); *accord Tucker*, 998 F.3d at 173-74 ("For conduct to be objectively unreasonable in light of clearly established law, there need not be a case directly on point, but 'existing precedent must have placed the statutory or constitutional question beyond debate.'" (quoting *White*, 137 S. Ct. at 551 (internal quotation marks omitted); citing *Mullenix*, 577 U.S. at 14)).

"The central concept is that of 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Trammell v. Fruge*, 868 F.3d 332, 339 (5th Cir. 2017) (quoting *Ramirez v. Martinez*, 716 F.3d 369, 379 (5th Cir. 2013) (quoting, in turn, *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc))).

"In other words, 'there must be adequate authority at a sufficiently high level of specificity to put a reasonable official on notice that his conduct is definitively unlawful.'" *Cunningham*, 983 F.3d at 191 (quoting *Vincent*, 805 F.3d at 547).

Under the second approach to demonstrating clearly established law, a plaintiff asks the Court to look to "the 'rare' possibility that, in an 'obvious case,' analogous case law 'is not needed' because 'the unlawfulness of the [challenged] conduct is sufficiently clear even though existing precedent does not address similar circumstances.'" *Joseph*, 981 F.3d at 330 (quoting *Wesby*, 138 S. Ct. at 590); *accord Batyukova*, 994 F.3d at 726; *Villareal v. City of Laredo, Tex.*, 17 F.4th 532, 539-40

(5th Cir. 2021).

"[I]n an obvious case, general standards can [therefore] 'clearly establish' the answer, even without a body of relevant case law." *Roque*, 993 F.3d at 335 (cleaned up; quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)). But "[t]he standard for obviousness is sky high." *Joseph*, 981 F.3d at 338. And "plaintiffs are only excused of their obligation to identify an analogous case in 'extreme circumstances' where the constitutional violation is 'obvious.'" *Cope*, 3 F.4th at 206 (quoting *Taylor v. Riojas*, 141 S. Ct. 52, 53-54 (2020) (per curiam)); *see also Villareal*, 17 F.4th at 540 ("The point is this: The doctrine of qualified immunity does not always require the plaintiff to cite binding case law involving identical facts. An official who commits a patently 'obvious' violation of the Constitution is not entitled to qualified immunity." (quoting *Hope v. Pelzer*, 536 U.S. 730, 745 (2002))).

### B. Clyce's version of the facts supported by evidence does not show that either Wright or Williams violated his constitutional rights.

Because a "court [must] consider the officers actions separately," the undersigned will begin with Clyce's version of the facts supported by proper summary judgment evidence specific to each officer. *Meadours*, 483 F.3d at 422; *Ramirez*, 3 F.4th at 136 n.4 ("Our precedent makes clear that 'we examine each individual's entitlement to qualified immunity separately.'" (quoting *Carroll v. Ellington*, 800 F.3d 154, 174 (5th Cir. 2015); collecting cases)). In this regard, Clyce's burden is "[t]o rebut [each officer's] qualified immunity defense" by "[p]oint[ing] to summary judgment evidence" "'that [the particular officer] violated a federal statutory or constitutional right.'" *Cloud*, 993 F.3d at 383 (quoting *Rich*, 920 F.3d at 294).

Clyce makes various factual allegation specific to Wright in the FAC, including that Wright "moved [him] from his cell into a solitary confinement cell as punishment for talking, [in] violation of facility policy"; that "he felt like his leg was out of socket, as a result of being restrained about three times the day before by Officer Kenneth Wright"; "that Officer Wright punched him in the leg during that time period"; and that a staff member at the facility, who may have been Wright "administered blue pills [to him] in an effort to sedate him and control his behaviors" and the assaulted him. Dkt. No. 99, ¶¶ 19, 20, 30 & n.2.

He alleges that Williams, as the Lead Officer, was, at the least, a shift supervisor at the detention center to whom at least one officer conveyed the concerns of Clyce's mother regarding his condition – and his mother's request that Clyce be immediately taken to an emergency room. *See id.*, ¶¶ 8, 12, 26, 27, 32. Clyce also alleges that his mother spoke with Williams directly to express "her concerns about her son's injuries and failure to eat. In response, [his] mother remembers that Williams just 'shrugged her shoulders.'" *Id.*, ¶ 27; *see also id.*, ¶ 37. Yet Clyce further alleges that Williams conveyed these concerns to Farley. *See id.*, ¶ 28.

But Clyce cannot rest on these allegations at this stage. *See Renfroe v. Parker*, 974 F.3d 594, 599 (5th Cir. 2020) (holding that "[t]he district court cannot be said to have resolved conflicting facts in favor of" a defendant where a plaintiff does "not offer any competent evidence of her own alleged facts" (citing *Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 713 (5th Cir. 1994) ("Conclusory allegations unsupported by specific facts ... will not prevent an award of summary

judgment; the plaintiff [can]not rest on his allegations ... to get to a jury without any significant probative evidence tending to support the complaint.")))

Recognizing this, after Wright and Williams moved for summary judgment on their assertions of qualified immunity, offering their own evidence, *see* Dkt. No. 104-1, the Court allowed Clyce the opportunity to move for leave to conduct discovery targeted at uncovering facts that the Court needs to rule on qualified immunity, *see* Dkt. No. 105. In short, he was given the opportunity to ensure that the Court has all the evidence – including evidence to support his version of the facts – that the Court needs to rule on the qualified-immunity-based motion for summary judgment. Clyce never moved for leave, signaling both that he had what he needs and that the Court need consider no further evidence to rebut the assertions of qualified immunity. So the Court must consider the record as it stands.

Starting with Wright, while Clyce does repeat certain allegations specific to this defendant in his response to Wright's motion for summary judgment, *see* Dkt. No. 111, ¶ 16, the only record evidence cited in this paragraph [Dkt. No. 111-1 at 84], a room check log, does not support Clyce's contentions against Wright. Nor do, for example, the declarations from Clyce, his mother, and his sister. *See id.* at 5-15.

In contrast, Wright offers his own affidavit, to which he attaches incident reports. *See* Dkt. No. 104-1 at 13-26. Wright testifies in applicable part that,

> [a]t no time during this timeframe did I deny Chance Clyce medical attention and the Hunt County Juvenile Detention Center's policy is to seek medical care for a juvenile requesting medical attention. In fact, l provided him ice and prescribed medications as directed by the lead officer. (See attached Incident Report from March 7, 2008)
> I never administered medications of my own accord. Medications

were kept under lock and key and only administered per the lead officer.

I became aware that Clyce was having hip/leg pain and I made sure my superior officers were informed. I was aware that he was to be seen by a doctor, but I was not privy to any complaints made by his family.

I recall one incident during a period when Clyce was required to abide by "Room Therapy" for violating certain rules of detention. This would have involved limited activities and privileges for a 24-hour period or less and in accordance with the Center's policy (I never placed him in "Solitary Confinement"). When escorting Clyce back from the classroom, Clyce refused to return to his room after being asked several times. After repeating my commands and raising my voice a degree. Clyce returned to his cell voluntarily. I did not have to go hands-on or use any physical force to gain compliance. I never restrained Clyce, and never "punched" him. The only physical contact I made with Clyce at any time was restricted to routine security "pat downs" performed pursuant to the Center's policy.

*Id.* at 14.

As to Wright then, Clyce has not carried his burden as to qualified immunity's first prong: to rebut Wright's good-faith assertion of qualified immunity with "summary judgment evidence" showing that he "violated a federal statutory or constitutional right." *Cloud*, 993 F.3d at 383. The Court should therefore grant Wright summary judgment on qualified immunity and dismiss the claims against him with prejudice.

Turning to Williams, like with Wright, Clyce's response reiterates allegations specific to Williams, emphasizing Clyce's allegations that she was a supervisor. *See* Dkt. No. 111, ¶¶ 1, 9, 22, 23, 26, 29, 36. But the only evidence that he offers to support these allegations is from his mother's declaration, in which she testifies:

I knocked on the window in the control room; I think it was Shanigua that came out to talk to me. I told her Chance has to go to the Emergency Room, now! She went and asked her supervisor. She came back and told me, "No, Chance is planned to go to the doctor on Monday, March 10, 2008; he cannot go today!" She told me she did not know how

> he hurt himself; that the bunks are very close to the floor. I told her, "He has to go to the Doctor, now! What if he dies?" or words to that effect. She shrugged her shoulders and made an expression to me that I interpreted to mean something like "Oh Well."

Dkt. No. 111-1 at 8-9 (¶ 13). *Compare id.*, *with id.* at 12, 27-33, 53, 97, 98, 101-02, 111, 138 (cited in response but not supporting the associated statements).

Like Wright, Williams also submitted an affidavit. *See* Dkt. No. 104-1 at 3-12. Through her affidavit, Williams explains her role as lead officer: "My main responsibility at that time was to remotely operate the cells within the facility and I also kept shift logs. I had little personal interaction with the residents. Although I was often designated as lead officer for my shift, this referred to the lead in the control room, rather than a supervisory position. Though as lead officer I would assign certain duties to other officers strictly during the shift, I had no disciplinary authority over my co-workers." *Id.* at 3-4. Clyce offers no evidence to refute this.

Williams further corroborates that she interacted with Clyce's mother:

> I first became aware of Clyce's complaints of hip pain on March 8, 2008. I was also informed he had a doctor's appointment scheduled two days later. I recall a visitation session that first day when Clyce's mother asked that her son be taken to the Emergency Room. This surprised me because Clyce had not complained of pain that day. Pursuant to the Center's policy, I immediately called the on-call Juvenile Probation Officer for Ellis County, where Clyce was on juvenile probation, and I immediately alerted my chain of command, as shown in the Incident Report dated April 4. 2008 attached as Exhibit "B." Though Clyce had not voiced any complaints that day until the visit with his mother, I personally gave Clyce two aspirin and monitored Clyce for the remainder of my shift with no issues.

*Id.* at 4.

Even construing all this evidence in Clyce's favor – accepting his mother's testimony that Williams "shrugged her shoulders and made an expression …

mean[ing] something like 'Oh Well'" – this evidence does not support that Williams committed a constitutional violation, as Clyce's mother further testified that Clyce was taken for medical care on March 10, 2008, *see* Dkt. No. 111-1 at 9 (¶ 15), and Clyce's mother does not refute that Williams informed her supervisor of the mother's concerns. In fact, as set out above, Clyce alleges that she did take this action. *See* Dkt. No. 99, ¶ 28.

To show retaliation in violation of the First Amendment – under the theory alleged in the FAC, that Clyce was retaliated against "because he and his parents complained to the Hunt County staff regarding the request that he receive necessary medical and mental health care," Dkt. No. 99, ¶¶ 52, 53 – the Court may not infer from this evidence that Williams intended to retaliate against Clyce based on assertions of constitutionally-protected speech. That is, Clyce has not shown that this allegedly retaliatory motive delayed his receiving medical care. *See Batyukova*, 994 F.3d at 730 ("'To prevail on [a First Amendment retaliation] claim, a plaintiff must establish a "causal connection" between the government defendant's "retaliatory animus" and the plaintiff's "subsequent injury."' The officer's retaliatory motive 'must cause the injury.' 'Specifically, it must be a "but-for" cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive.'" (quoting *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019))); *see also Pinson v. Santana*, No. 3:13-cv-2098-D, 2015 WL 10550962, at *5 (N.D. Tex. Nov. 23, 2015) ("The necessary elements of a valid retaliation claim require the prisoner to state '(1) a specific constitutional right, (2) the defendant's intent to retaliate against the

prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation.' An inmate 'must allege more than his personal belief that he is the victim of retaliation; that is, mere conclusory allegations of retaliation are not sufficient to state a claim for retaliation.' Further, the 'inmate must either produce direct evidence of motivation or allege a chronology of events from which retaliation may plausibly be inferred.'" (citations omitted)), *rec. adopted*, 2016 WL 1161991 (N.D. Tex. Mar. 23, 2016).

The evidence against Williams also does not support that she acted with deliberate indifference toward Clyce, in violation of his constitutional rights.

The Fifth Circuit "has based its Fourteenth Amendment case law concerning pretrial detainees on the Supreme Court's Eighth Amendment precedent concerning prisoners. Among those borrowings is our understanding of subjective deliberate indifference." *Garza v. City of Donna*, 922 F.3d 626, 634 (5th Cir. 2019) (citations omitted).

> When, as in this case, "a pretrial detainee's claim is based on a jail official's episodic acts or omissions, the proper inquiry is whether the official had a culpable state of mind in acting or failing to act." *Hare v. City of Corinth*, 74 F.3d 633, 643 (5th Cir. 1996) (en banc). An official "violates a pretrial detainee's constitutional right to be secure in his basic human needs only when the official had subjective knowledge of a substantial risk of serious harm to the detainee and responded to that risk with deliberate indifference." *Estate of Henson v. Wichita Cnty.*, 795 F.3d 456, 464 (5th Cir. 2015) (internal quotation marks and citation omitted). Although deliberate indifference is a high bar and requires egregious conduct, plaintiffs need not prove that the official acted with the intent to cause harm. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994) (stating that deliberate indifference "is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result"). "Deliberate indifference is an extremely high standard to meet" but can be satisfied by a "wanton

disregard for [an inmate's] serious medical needs." *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001)....

When multiple officials are named as defendants, we "evaluate each officer's actions separately, to the extent possible." *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012).

*Cope*, 3 F.4th at 206-07 (citations modified); *see also Alvarez v. City of Brownsville*, 904 F.3d 382, 391 (5th Cir. 2018) (en banc) ("Deliberate indifference is a degree of culpability beyond mere negligence or even gross negligence; it must amount to an intentional choice, not merely an unintentionally negligent oversight." (quoting *James v. Harris Cnty.*, 577 F.3d 612, 617-18 (5th Cir. 2009) (quoting, in turn, *Rhyne v. Henderson Cnty.*, 973 F.2d 386, 392 (5th Cir. 1992)))); *Kelson v. Clark*, 1 F.4th 411, 417 (5th Cir. 2021) ("'[D]eliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm.' Rather, 'the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."'" (citations omitted)).

The Court should therefore grant Williams summary judgment on qualified immunity and dismiss the claims against her with prejudice.

### C.    Clyce also has not shown that either Wright or Williams violated a federal right that was clearly established.

Clyce's version of the disputed facts supported by proper summary judgment evidence "must also constitute a violation of clearly established law." *Joseph*, 981 F.3d at 330. But he has not satisfied this difficult-to-satisfy, independent prong that a plaintiff must show to rebut qualified immunity.

First, the properly supported facts fail to show that this case presents "'extreme circumstances' where the constitutional violation is 'obvious.'" *Cope*, 3 F.4th at 206; *see, e.g.*, *Hope v. Pelzer*, 536 U.S. at 734-35, 739-41 (handcuffing a prisoner to a hitching post for seven hours in the sun with little water, while taunting him and refusing to allow him to use the restroom); *Taylor*, 141 S. Ct. at 53 (prison cells containing massive amounts of feces over a six-day period); *see also Joseph*, 981 F.3d at 337-38 (setting out other examples of extreme cases in which the Fifth Circuit found an obvious constitutional violation).

Relatedly, the district court in 2011 explained:

> The Court sympathizes with the Plaintiffs' argument that the severity of Chance's infection could have been lessened if Chance had received treatment earlier. The Plaintiffs may be correct. But, even if so, that is not evidence of deliberate indifference. To the contrary, Chance did receive medical treatment twice while at the Detention Center. Chance showed no indications of illness at a doctor's visit on March 3, 2008, to obtain medication unrelated to his injuries. Chance saw another doctor on March 10, 2008. At that appointment, Chance attributed his injuries to falling off his bed and from sleeping hard on his elbow. The second doctor ordered x-rays and diagnosed Chance with a bruised hip, bruised ribs, a muscle pull, and an arm fracture. Although there is some evidence that Chance's injuries were inconsistent with his story, nothing causally links the injuries or the second doctor's failure to diagnose Chance's MRSA infection to Hunt County policy. Accordingly, the Court grants Hunt County summary judgment on the Plaintiffs' section 1983 claims.

*Clyce v. Hunt Cnty., Tex.*, No. 3:09-cv-351-N, 2011 WL 13127663, at *4 (N.D. Tex. Aug. 30, 2011) (citations omitted).

Because Clyce has not carried the admittedly "sky high" burden to show that analogous case law is not necessary, *Joseph*, 981 F.3d at 338, he may only rebut qualified immunity's second prong by identifying a case or body of relevant case law

in which a public official under circumstances like those here was found to have violated the Constitution. He identifies no "[p]recedent involving similar facts." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam). But Clyce does identify two unpublished Fifth Circuit decisions from this past summer: *Rombach v. Culpepper*, No. 20-30554, 2021 WL 2944809 (5th Cir. July 13, 2021) (per curiam), and *Hope v. Harris*, 861 F. App'x 571 (5th Cir. 2021) (per curiam). *See* Dkt. No. 111 at 24-27.

Neither does the work that Clyce needs them to do. First, neither decision could have provided fair notice to an officer in March 2008. *See Pearson*, 555 U.S. at 232 ("[T]he right at issue [must be] 'clearly established' at the time of the alleged misconduct."). And, "[a]lthough we know the Supreme Court's decisions can clearly establish the law, the Supreme Court has never held that [a Court of Appeals's] decisions can do the same." *Nerio*, 974 F.3d at 576 n.2 (citing *Wesby*, 138 S. Ct. at 591 n.8 ("We have not yet decided what precedents – other than our own – qualify as controlling authority for purposes of qualified immunity.")).

More importantly, even if the cases Clyce cites to were proper precedent that existed at the time of the alleged misconduct, Clyce has not shown that the circumstances underlying either can provide fair notice to the officers here. That is, he has not shown how either case involves circumstances like those encountered by Wright and Williams as reflected by his version of the disputed facts supported by proper summary judgment evidence. *See, e.g., Hope v. Harris*, 861 F. App'x at 583-85 (concluding that the plaintiff had alleged deliberate indifference as to one defendant

based on his knowledge of "the unsanitary conditions and chemical agents, which have an obvious risk of harm"); *Rombach*, 2021 WL 2944809, at \*7-\*8 (conducting an exhaustive comparison of the underlying facts to those in *Thompson v. Upshur County*, 245 F.2d 447 (5th Cir. 2001), and a "non-precedential case," *Rodrigue v. Grayson*, 557 F. App'x 341 (5th Cir. 2014); concluding that "*Thompson* and *Rodrigue* are easily distinguishable from the present case. Neither confronts an inmate suffering from heroin withdrawal coupled with an undiscovered perforated stomach ulcer. The inmates' conditions in *Thompson* and *Rodrigue* were continuous, acute, and observed. By contrast, there is no specific evidence showing that any officer witnessed Rombach vomiting or struggling to eat. Additionally, Rombach was neither hallucinating, nor seizing, nor injuring himself. Moreover, the relevant time frame in the present case spanned roughly seventy-two hours. In that time, it is alleged Rombach verbally requested medical attention twice. However, the record also includes unrefuted testimony that when officers questioned Rombach about his drug withdrawal, he replied that 'he was fine.' And Rombach stated on his intake forms that he was not using alcohol or drugs, he was not in withdrawal, and he did not need medical attention. He also did not appear intoxicated or under the influence at the time of his arrest, and the record supports that the officers followed the local hospital's advice concerning proper treatment of withdrawal symptoms…. Given the materially unrefuted evidence, we cannot conclude that, in the light of clearly established law, every reasonable correctional officer would have summoned medical assistance before Rombach's death." (citations and footnote omitted)).

## Recommendation

The Court should grant the pending motion [Dkt. No. 104] insofar as it should dismiss the claims against Defendant Frederick Farley with prejudice under Federal Rule of Civil Procedure 25(a); grant Defendants Kenneth Wright's and Shanigia Williams's requests for summary judgment on qualified immunity, dismissing the claims against them with prejudice; and enter final judgment accordingly.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: January 28, 2022

DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE